## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse at Foley Square     40 Centre Street, New York, NY 10007     Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Caption [use short title]

Docket Number(s): **05-6256-PR**

Motion for: **WRIT OF HABEAS CORPUS**

Set forth below precise, complete statement of relief sought:
**WRIT OF HABEAS CORPUS; STAY UNDER 28**
**U.S.C. 2251; INJUNCTION AGAINST FURTHER**
**PROSECUTION OF PETITIONER; FEDERAL PROSECUTION AND**
**ARREST OF PETITIONER'S RAPIST**

*In stamp:* UNITED STATES COURT OF APPEALS FILED NOV 18 2005 Roseann B. MacKechnie, CLERK SECOND CIRCUIT

**IN RE:**

**SEPHORA K. DAVIS,**

**PETITIONER**

MOVING PARTY: **SEPHORA K. DAVIS**     OPPOSING PARTY: **NOT APPLICABLE**

☒ Plaintiff     ☐ Defendant
☐ Appellant/Petitioner     ☐ Appellee/Respondent

MOVING ATTORNEY: **JOHN M. REGAN JR.**     OPPOSING ATTORNEY [Name]: **N/A**
[name of attorney, with firm, address, phone number and e-mail]     [name of attorney, with firm, address, phone number and e-mail]
**REGAN ATTORNEYS**
**29 HOYT PLACE**
**ROCHESTER, NY 14610**
**(585) 739-7924**
**jregan3@rochester.rr.com**

Court-Judge/Agency appealed from: **NOT APPLICABLE**

Please check appropriate boxes:

Has consent of opposing counsel: **N/A**
  A. been sought?     ☐ Yes     ☒ No
  B. been obtained?     ☐ Yes     ☐ No

Is oral argument requested?     ☒ Yes     ☐ No
(requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?     ☐ Yes     ☒ No
If yes, enter date _____

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:

Has request for relief been made below?     ☐ Yes     ☐ No
  **N/A**

Has this relief been previously sought
in this Court?     ☐ Yes     ☒ No

Requested return date and explanation of emergency:
_____
_____
_____

Signature of Moving Attorney:
_John M. Regan_     Date: **11-3-05**     Has service been effected?.     ☐ Yes     ☐ No
[Attach proof of service]

### ORDER

*In stamp:* UNITED STATES COURT OF APPEALS FILED DEC 7 2005 Roseann B. MacKechnie, CLERK SECOND CIRCUIT

Before: Hon. Peter W. Hall, *Circuit Judge*

Upon consideration of the motion to file an application for writ of habeas corpus in the Court of Appeals, that motion is DENIED. The application is hereby transferred to the United States District Court for the Western District of New York. *See* Fed. R. App. P. 22(a). The Clerk is instructed to transmit this case forthwith.

**12/7/05**
Date

FOR THE COURT:
ROSEANN B. MACKECHNIE, Clerk
by _Arthur M. Heller_
Arthur M. Heller
Motions Staff Attorney

BEFORE HON. RICHARD C. WESLEY,
JUDGE OF THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

In Re:

SEPHORA K. DAVIS,

              Petitioner.

PETITION FOR WRIT
OF HABEAS CORPUS
28 U.S.C. 2254

EVIDENTIARY
HEARING
REQUESTED

---

## INTRODUCTION

1.  Petitioner is a twenty year old female citizen and resident of the Town of Avon,

Livingston County, New York.  She is currently in custody, being held on house arrest and

$35,000 bail based upon an indictment designated 2004-276 filed in the office of the Livingston

County Clerk charging her as an accessory - more or less as the "wheel man" - with Kidnapping,

Armed Robbery and other violent felonies.  If convicted, she faces up to 25 years to life in state

prison. The Livingston County District Attorney is prosecuting the indictment in Livingston

County Court before Hon. Ronald A. Cicoria, Judge.  As more fully appears below, she is being

held and prosecuted in a grotesque violation of the Constitution of the United States.  She brings

this Petition through undersigned counsel, an attorney duly admitted in the courts of the State of

New York, in the United States District Court for the Western District of New York,  and in the

United States Court of Appeals for the Second Circuit.

## JURISDICTION

2.  Your honor has jurisdiction to hear and decide this Petition under 28 U.S. Code

2241(a), which provides that:

> "Writs of habeas corpus may be granted by the Supreme Court,
> any justice thereof, the district courts and any circuit judge

1

within their respective jurisdictions. The order of a circuit
judge shall be entered in the records of the district court of the
district wherein the restraint complained of is had."

3. It is worth noting that whereas jurisdiction to hear original habeas petitions is

conferred upon the United States Supreme Court or United States District Courts, at the circuit

court level jurisdiction resides only in individual judges, not the Court as a whole.

4. Admittedly, the issue of whether your honor should hear and decide this Petition is

substantially more problematic than that. In the first place, there is 28 U.S.C. 2242, which

further provides:

"If addressed to the Supreme Court, a justice thereof or a
circuit judge it shall state the reasons for not making
application to the district court of the district in
which the applicant is held."

As your honor will note from what follows, there are several excellent reasons why your honor

should personally entertain this Petition which are of such a rare - and perhaps unique - character

that we needn't fear opening a Pandora's box of habeas petitions being presented to federal

circuit judges.

5. But before that issue is reached, it is necessary to address the impact upon this

application to your honor of Federal Rule of Appellate Procedure 22(a):

"An application for a writ of habeas corpus must be made to the
appropriate district court. If made to a circuit judge, the
application must be transferred to the appropriate district court.
If a district court denies an application made or transferred to
it, renewal of the application before a circuit judge is not
permitted. The applicant may, under 28 U.S.C. § 2253, appeal to
the court of appeals from the district court's order denying
the application.

6. Whether FRAP 22(a) requires a circuit court of appeals judge to "transfer" an

application for a writ of habeas corpus "made" to him or her "...to the appropriate District

Court", *without hearing or deciding it,* is a question of first impression, and a rather difficult one

at that. Even so, I respectfully submit to your honor the answer to that question is no, based upon

time honored rules of statutory construction, case law precedent, and in this case foundational

principles of equity and justice.

7. Clearly, the practice of bringing original habeas corpus petitions to circuit court of appeals judges is, to say the least, not favored, and the exceedingly sparse history of attempts to do so is not a pretty one. In the most recent case, <u>Woodard v. Hutchins</u>, 464 U.S. 377 (1984), a single Circuit Court Judge from the Fourth Circuit, a Judge Phillips, stayed a petitioner's execution. Within hours, the United States Supreme Court vacated the stay upon application by the State, over several pointed dissents. It appears the overriding concern of the Court in the matter was that the venerable writ was being abused. Prior to that, in <u>Spenkelink v. Wainwright</u>, 442 U.S. 901 (1979), the Supreme Court declined to vacate a stay of execution ordered by a Judge Elbert Tuttle of the Fifth Circuit, but the Fifth Circuit Court of Appeals took a strong position - albeit there was no basis for that Court, sitting as a Court, to exercise jurisdiction in the matter - and purportedly vacated that stay, also within hours of when it was originally granted. See also, Hertz & Liebman, <u>Federal Habeas Corpus Practice and Procedure</u>, Fourth Edition, Volume 2, Matthew Bender & Co., 2001, section 40.3 That story was further expounded by former U.S. Attorney General Ramsey Clark in an article entitled *Spenkelink's Last Appeal*, 229 NATION 385 (1979).

8. Significantly, in neither <u>Woodard</u> nor <u>Spenkelink</u> was there any question that a single circuit judge had jurisdiction to grant an original writ of habeas corpus or to order a stay, although even at that time, and for a considerable time before that, such applications were extremely rare.

9. FRAP 22(a) was enacted as part of the Anti-Terrorism and Effective Death Penalty Act (AEDPA) of 1996 to curb abusive practices with respect to "11th hour" habeas corpus applications in death penalty cases. I ask your honor to note, the Petitioner's case is not a death penalty case, and this is not an "11th hour" application.

10. Shortly after its enactment, the Supreme Court considered the question of whether

3

the AEDPA amounted to a "suspension" of the writ with respect to its own jurisdiction to hear

habeas petitions in violation of Article I, section 9 of the United States Constitution.  <u>Felker v.</u>

<u>Turpin</u>, 518 U.S. 1051 (1996)  The Court held it was not, primarily because - and again this is

significant - the Supreme Court retained jurisdiction to hear original habeas corpus Petitions,

although in practice that jurisdiction is so rarely exercised as to be largely illusory.

     11.  I must also bring to your honor's attention some dicta in the <u>Felker</u> opinion, because

I take my obligation to fully brief your honor on any aspect of the law governing this matter very

seriously, including any law that might not support Petitioner's position:

> "Turning to the present case, we conclude that Title I of the Act
> has not repealed our authority to entertain original habeas
> petitions, for reasons similar to those stated in *Yerger*. No
> provision of Title I mentions our authority to entertain original
> habeas petitions; in contrast, §103 amends the Federal Rules of
> Appellate Procedure to bar consideration of original habeas
> petitions in the courts of appeals."

<u>Felker</u>, <u>supra</u>, 518 U.S. at 1053

     12.  The above dicta in the late Justice Rehnquist's opinion could be interpreted as

expressing his view that the AEDPA divests Circuit judges of jurisdiction to hear original habeas

corpus petitions, but your honor should not so interpret it.  In the first place, one would have to

conclude the Chief Justice misspoke, since he states that FRAP 22(a) "...bar[s] consideration of

original habeas petitions in the courts of appeals."  But the "courts" of appeals did not have

jurisdiction in any event; only circuit court *judges* did.

     13.  Beyond that, if one wishes to apply the central holding of <u>Felker</u> to the instant

application, the only reasonable conclusion would be that to interpret FRAP 22(a) in such a

manner that it divests circuit judges of the jurisdiction to grant original habeas corpus petitions

that is plainly conferred by 28 U.S.C. 2241 amounts to a "suspension" in violation of Article I,

section 9 of the United States Constitution.  Petitioner submits that to interpret a statute so as to

make it unconstitutional must be avoided unless there is no alternative.  In addition, your honor

should reject such an interpretation for the same reason the U.S. Supreme Court has repeatedly

4

rejected the same sorts of interpretations with respect to its own jurisdiction: it would amount to

a repeal (of 28 U.S.C. 2241) by implication, and such a result is not favored.

14. As it happens, and happily, your honor need not adopt an interpretation of FRAP

22(a) that offends the constitution or other settled principles of law:

a) FRAP 22(a) states that a habeas application to a circuit judge must be transferred to
the appropriate district court. It does not say when, or at what stage of the proceedings this must
be done. It does not say that the circuit judge must not entertain or decide the matter. Of course,
the circuit judge *may* transfer the application to the district court without entertaining or deciding
it, but that is not explicit or mandatory. Indeed, the next sentence doesn't really make sense
unless the circuit court judge can do either.[1]
b) The first sentence also says that an application must be made to the appropriate
district court. But this sentence should be interpreted harmoniously with what is already
provided in 28 U.S.C. 2241(a): "The order of a circuit judge shall be entered in the records of
the district court of the district wherein the restraint complained of is had." Since the Courts of
Appeals do not have jurisdiction, *as courts*, to grant original habeas applications - but individual
court of appeals judges do - then the clerk's office of the appropriate District Court is given the
administrative duties with respect to these actions of a court of appeals judge, not the clerk's
office of the Court of Appeals in which the Circuit Judge sits. That, I respectfully submit, is the
sole import of the first sentence of FRAP 22(a). Indeed, the Second Circuit Court of Appeals
clerk's office has no provision for accepting original petitions for a writ of habeas corpus.
c) Moreover, the first sentence and second sentence of FRAP 22(a), taken together,
would be practically incoherent otherwise, for immediately after stating, in the first sentence, that
the application "must be made" to the District Court, the statute would contemplate, in the
second sentence - indeed in the very next phrase - an application "made to a circuit judge", which
the first sentence would have just ruled out.

15. Finally on the issue of jurisdiction, it will become clear to your honor from what

follows that this application does not in any sense constitute the type of "abuse of the writ" that

the AEDPA or other statutory or informally observed strictures of ordinary habeas practice seek

to curtail. I respectfully submit that based upon all relevant considerations, your honor is by far

---

[1] If the application is denied by the district court, "…renewal of the application before the circuit judge is
not permitted." This should be interpreted to apply only in those situations where the circuit court judge has
transferred the application without hearing or deciding it, which he clearly *may* do but does not *have to do*.
Under such circumstances, the circuit court judge having already determined that he will not hear the
application as an original petition, it makes sense to bar the application from being "renewed", so that only
the elsewhere-described regular appellate practice would apply at that point. And that meaning is what the
very next sentence of FRAP 22(a) confirms. In short, it would not be necessary to bar a "renewal" if the
original application could never have been entertained or decided by a circuit judge in the first place, and
such an interpretation reduces this sentence of the statute to meaninglessness - an impermissible method of
statutory construction.

the most appropriate federal judge in the country to hear and determine this application.  I further

submit that, following the practice of the United States Supreme Court, the application should

first be considered *Ex Parte*, until your honor has determined exactly what other parties should

be put on notice and heard in the matter.

## REASONS FOR NOT MAKING APPLICATION TO THE DISTRICT COURT OF THE DISTRICT IN WHICH THE APPLICANT IS HELD (28 U.S.C. 2242)

### A. GEOGRAPHICAL PROXMITY

16.  Geographic boundaries define the jurisdiction of courts at the most fundamental

level.  It is the reason that the Second Circuit Court of Appeals does not hear appeals from, say,

the State of Georgia.

17.  Your honor maintains a local chambers in the Village of Geneseo, New York.  Thus

your honor, by several orders of magnitude, is the closest federal judge to all of the events and

proceedings that must be considered in deciding this application.  The nearest United States

District Court is in the City of Rochester, some 35 miles away.  By contrast, your honor's

Geneseo chambers are about 35 *feet* away from the most significant events and proceedings

pertaining to this application.  In deciding the application, for example, your honor will need to

obtain the records of the proceedings in state court.  They are located in the clerk's office

downstairs from your Geneseo chambers.

18.  It is worth noting that when the Supreme Court declined to vacate the stay ordered

by Judge Tuttle in Spenklink, the late Justice Rehnquist made the following observation in

dissent:

> "Moreover, respondent, for unexplained but obvious reasons,
> presented his original petition not to the United States District
> Court for the Northern District of Florida, the jurisdiction in
> which he is detained and which had twice denied him post-
> conviction relief, *but to a Senior Circuit Judge residing several
> hundred miles away in Atlanta, Ga.* Title 28 U.S.C . 2242, designed
> to deter such forum shopping, requires that petitions for habeas
> corpus "addressed to the Supreme Court, a justice thereof or a

```
circuit judge . . . shall state the reasons for not making
application to the district court of the district in which the
applicant is held." Nowhere in respondent's original petition is
such an allegation made." (emphasis added)
```

The implication of this language is that, at least in the opinion of the late Chief Justice,

geographical proximity is an important factor in deciding whether a circuit judge should hear an

application instead of a District Court Judge.

19. A closely related consideration is that the very complicated facts underlying this

application require a thorough knowledge of places and locations that, to those outside of

Livingston County, New York, are remote and obscure:  places such as Nunda, Mount Morris,

Geneseo, Leicester, and Avon.  As will become clear to your honor from what follows, it is not

only necessary to be familiar with these towns and villages, but also the distances and travel

times between them.  As a life long resident of the area who at one time represented most or all

of these locations in the New York State Assembly, your honor has better knowledge of these

important matters of judicial notice than any other federal judge.

## B. JUDICIAL ECONOMY

20. In addition to presenting a question of first impression relative to jurisdictional

issues, this application will provide an opportunity to decide an important question of

constitutional law which, while it has been raised and considered, has not been decided:  namely,

is there a constitutional right to be free from a wrongful prosecution under substantive or

procedural "due process" grounds, or in the alternative as a violation of the right to be free from

an "unreasonable seizure" under the fourth amendment?

21. The United States Supreme Court considered that question 11 years ago and issued a

plurality opinion.  Albright v. Oliver, 510 U.S. 266 (1994)  As your honor is aware, a plurality

opinion leaves the question largely open and provides little if any guidance to lower courts as to

7

the correct answer.[2]

22. Were the Petitioner to bring this application to a district court judge and the district court judge were to decide it, there would be little precedential guidance for any other federal court on this important question of constitutional law, and as a result it would invite further litigation on the question throughout the second circuit. By contrast, if your honor decides the issue, all of the trial courts of the Second Circuit will have a ruling they are bound to follow, resulting in a smoother and more certain administration of justice throughout New York, Vermont and Connecticut. And your honor's decision will have more persuasive value in other circuits as well.

23. Accordingly, it is respectfully submitted that considerations of judicial economy and the sound administration of justice heavily favor your honor hearing and deciding this application.

## C.  YOUR HONOR'S PROFESSIONAL EXPERIENCE AND QUALIFICATIONS

24. Your honor's legal experience includes about three decades of rigorous effort, much of it as a private practitioner. In addition, your honor spent a considerable period on the bench in a busy trial court, conducting trials and evidentiary hearings on a daily basis. This experience extends to both civil and criminal matters. There are many appellate level judges who do not have such experience; by contrast, your honor has a demonstrated ability to sort through complicated facts, to assess witnesses and litigants, and to make just determinations in the end.

25. As will become clear shortly - and I know I have, of necessity, spent a lot of ink on preliminaries here - the Petitioner's nightmare began when she was 18 on December 8th, 2003 and continues to the present. On that day, she was raped at knife point and threatened with death

---

[2]  I will argue, _infra_, that your honor should adopt the reasoning of Justice Ginsburg's concurring opinion in the matter as the best guidance to follow, because Justice Ginsburg is the Supreme Court Justice for the Second Circuit in which we are located.

by a six foot four, three hundred pound, tatooed, skin headed monster only to find, about a week later, that the law enforcement personnel that would ordinarily undertake to console and protect her under such circumstances were instead trying to put her head in a noose for other violent crimes her rapist had committed at about the same time.  Not since Kafka or Les Miserables has even a fiction writer come up with a scenario so bizarre, outrageous and heart-breaking.

26.  At the time the Petitioner was already very psychologically fragile, having been psychiatrically hospitalized for about a week at the age of 16; then her condition understandably worsened under the onslaught of a major criminal prosecution she was powerless to effectively address or stop.

27.  The Petitioner has been a very difficult client, but there are reasons for this for which she is not at fault.  First, she was terrorized by, and terrified of, her rapist.  Then she feared the police, the prosecutor, and the judge, and understandably doubted that her attorney could protect her; thus she saw no point in cooperating.  She is entitled to a judge who will preside with an open mind and successfully reassure her she will have her day in court.  There is no doubt that your honor is that judge.

## EXHAUSTION OF STATE REMEDIES

28.  The Constitutional issues raised herein were presented to Judge Cicoria of the Livingston County Court through a motion for leave to reargue his previous denial of Petitioner's motion to dismiss the Livingston County indictment "in furtherance of justice" under section 210.40 of the New York Criminal Procedure Law.  Judge Cicoria denied that motion for leave to reargue on October 25th, 2005.  Neither Judge Cicoria's original denial of the motion, nor his denial of the motion to reargue, is appealable under New York State Law.  See New York State Criminal Procedure Law Article 450.  Therefore, as to the constitutional issue involved, i.e., the right to be free from a wrongful and unconstitutional criminal prosecution (cf., Albright, supra)

Petitioner's state court remedies have been exhausted: unless your honor intervenes, the state court prosecution will proceed.[3]

29.  In addition, the proceedings in state court have been marred by a glaring procedural defect that makes a fair determination of the questions posed in this Petition legally *impossible* in that court system.  In January, Petitioner moved for Judge Cicoria to recuse himself from the matter, on the ground that in April, 2004 he had approved a lenient plea bargain for Petitioner's rapist, and might not be able to fairly entertain a determination in the Petitioner's favor that would necessarily expose that approval as a very serious misjudgment.  Petitioner renewed that request shortly thereafter, based upon an incident at the courthouse on February 1st that made the judge's brother, who works there as a court deputy, a potential witness at Petitioner's trial.  Judge Cicoria never ruled on the motion to recuse.

30.  Petitioner is entitled to a ruling on her motion.  Her remedy is to seek a writ of mandamus under New York's CPLR Article 78.  In theory, there must be a chance for the recusal motion to be granted; but if that were to happen, Judge Cicoria's determinations on the underlying motions would bind his successor under the doctrine of "law of the case".

31.  The result would be anomalous and perverse:  the adverse rulings of an admittedly biased judge would determine the dispositive pre-trial motions in Petitioner's case.  Accordingly, Petitioner's state court remedies are not simply exhausted; they are legally and logically incapable of any fair adjudication.

---

[3]  There is one other issue on this point.  The Petitioner argued, through counsel, that she is not "fit to proceed" under NY CPL Article 730.  She was examined by two psychiatrists pursuant to that Article, one of whom found she was fit to proceed and the other of whom found she was not fit to proceed.  The state court ordered a neurological evaluation to resolve the conflict, but none has been conducted, so proceedings in state court are stayed pending some action on that order.

## FACTUAL AND PROCEDURAL BACKGROUND

32. December 8th, 2003 was a Monday.  Although enrolled and in good standing, the
Petitioner - then 18 years old - was only occasionally attending classes at high school in her
senior year.  Like many people her age, unfortunately, she used recreational (but illegal) drugs,
such as marijuana and "ecstasy".[4]

33. She had been up the night before with a terrible toothache.  Early morning she
sought treatment for this condition, driving herself from her home in Avon to Noyes Memorial
Hospital in Dansville, New York.  She was treated in the emergency room at about 10 AM, given
a 60 mg shot of a pain killer known as "Toradol" (twice the standard dosage) and slept for a brief
period.  She was discharged from the hospital at about noon.

34. She then drove to the apartment of her best friend, Mechal Fuoco, on Trumbull
Street in Mount Morris.  She had known Mechal since the second grade.  As of December 8th,
2003, Mechal Fuoco was living with a much older boyfriend named Edjamal Gonzales,
nicknamed "Cocoa".  Cocoa is known as a drug dealer in the Mount Morris area, and is a very
large man, perhaps 6 foot 5 and 300 pounds.  The Petitioner and Cocoa did not get along, so
Petitioner had made a practice of visiting her girlfriend Mechal during the day, when Cocoa was
not around.

35. At some point during their visit, the two girls decided to go see an acquaintance of
theirs named Adrian Paige.  Petitioner sometimes babysat Adrian's children, and also knew that
Adrian could supply her with marijuana.  Adrian lived in an apartment in Geneseo and was on
parole.

36. Petitioner drove herself and her girlfriend Mechal to Adrian's apartment near Route

---

[4] As of this writing, Petitioner is drug free and has been since February, 2005.  She is in regular treatment
through "drug court" in Buffalo, New York as a result of an arrest and charges stemming from that month.
In fact, Petitioner incurred a number of charges *after* December 8, 2003, but prior to that terrible day, upon
information and belief, she had incurred no criminal charges or convictions.

20A in the business district of Geneseo, arriving at about 2 PM.  The three of them did at some

point smoke some marijuana.  Adrian then asked the Petitioner to drive him to Mount Morris to

meet someone, and Petitioner agreed.  She, Mechal, and Adrian went in Petitioner's car to Mount

Morris.  Petitioner by this time was not fully cognizant or responsive - the effects of the shot of

Toradol she had received in the hospital that morning were compounded by the marijuana.

37.  The person Adrian wanted to meet was an individual named Eric Harder.  Eric

Harder lived at that time on North Main Street in the village of Mount Morris, also known as

Route 36.  Harder owed Adrian some money, and Adrian wanted to meet with him to enlist his

assistance in performing a burglary/robbery of some rival marijuana dealers, students at SUNY

Geneseo who supplied to other students on campus.  Adrian wanted to use someone else because

he was personally acquainted with his intended victims and feared being recognized.

38.  Eric Harder was at that time a very large man, about 6 foot 4 and 300 pounds.

Adrian left the girls in the car while he spoke to Harder, as he was keeping his plans from them.

Harder agreed to participate, and got in the car to go back to Adrian's apartment in Geneseo to

iron out details.

39.  At this point the four of them - Adrian, Mechal, Eric Harder and the Petitioner, ride

in Petitioner's car back to Geneseo to Adrian's apartment.  Petitioner was not following

conversations well, but Mechal learns of Adrian's plans and decides she wants to participate.

Adrian tells Petitioner that "We're going to get some weed.", and the group of four drives over to

the Court Street area in Geneseo, where Adrian and Petitioner stay in the car, parked nearby,

while Mechal and Eric Harder burglarize an apartment where they believe they will find money

and/or drugs.

40.  Harder and Mechal return to the car having been unsuccessful in locating any money

or drugs.  Petitioner drives Adrian back to his apartment and drops him off.  She then proceeds to

Mount Morris.  By the time she arrives there, it must be about 5 PM, and on December 8th it

would have been dark.

41. Petitioner drops off her girlfriend first on Trumbull Street, leaving Petitioner alone in the car with Eric Harder. She then begins to head home on her usual route - north on Route 36 - intending to drop Eric Harder off at his North Main Street apartment, but Harder begins speaking with her. He tells her he has some marijuana in his apartment and they can smoke some together. He tells her he doesn't have much, so he didn't want to mention it when others were present. She agrees and parks in the driveway of his residence at 79 North Main Street in Mount Morris.

42. Harder leads Petitioner into the house. She had the impression that someone else was there, but when they went in she and Harder were alone. They go to Harder's bedroom. Petitioner sits on the bed and Harder begins going through some drawers in a nearby dresser.

43. Instead of producing marijuana, Harder produces a knife. He forces the Petitioner to disrobe, then he rapes her at knifepoint. Petitioner can recall facts about the residence that only someone who had been inside would know.

44. Harder then tells Petitioner he is going to kill her. She begs for her life. He relents on his threat to kill her, but does not let her go. He permits her to get dressed. He tells her if she tells anyone what he did, he will kill her. He knows she has a younger sister, and he says if she tells anyone about the rape, he will kill the younger sister, too, and that he will find out where they live. Petitioner promises over and over again never to tell anyone. It is now approximately 7 PM.

45. Harder forces the Petitioner to drive back up Main Street, to Mechal's apartment on Trumbull Street in Mount Morris, a short distance away. Apparently, the Petitioner by this time is in no condition to drive, so he arranges on some pretext for Mechal to drive him and the Petitioner to Petitioner's house in Avon in Mechal's car.

46. The three arrive at Petitioner's house in Avon in Mechal's car at around 8 PM.

13

Petitioner and Mechal briefly enter the house, and are observed by family and friends. Harder stays in the car until they return. Then the group drives away.

47. At some point between then and about 10:30 PM, Petitioner, Mechal and Harder wind up back at Mechal's apartment in Mount Morris. By this time Cocoa - Mechal's drug dealer boyfriend - is present with another friend of his nicknamed "Titi". Her friend Mechal sees the Petitioner is hysterical and gives her a pill, probably a prescription narcotic called Vicodin, to "calm" her. Harder then arranges for Petitioner to be given some heroin, which Cocoa has on hand because he deals in it. After involuntarily and unknowingly taking the heroin, Petitioner is essentially incapacitated.

48. In the meantime, Adrian is planning another burglary/robbery attempt on the same drug dealers in Geneseo. He solicits the participation of yet another individual, a convicted felon named Shaun Theriault, who lives in Nunda. He also calls Petitioner hoping to arrange transportation. Petitioner, now located at Mechal's apartment in Mount Morris, is unable to answer her cell phone, but Cocoa answers it. He talks to Adrian and agrees to participate in this second attempt.

49. First, however, Eric Harder has to be taken to work - at Elijah House in Leicester. Cocoa drives Harder to work for the start of his shift at 11 PM in Mechal's car.

50. Cocoa returns to the apartment he shares with Mechal in Mount Morris. Shortly thereafter, at about 12:30 AM or so on December 9th, the entire group - at this point consisting of Cocoa, Mechal, "Titi", and the incapacitated Petitioner, get into Mechal's car with Cocoa driving.

51. They proceed back to Adrian Paige's apartment in Geneseo to pick him up, then to the Court Street area off the SUNY Geneseo campus, the same place Adrian had sought to burglarize earlier, on the afternoon of December 8th. Adrian observes the Petitioner is passed out in the back seat. Again, he stays in the car with the Petitioner, while Cocoa, Mechal, and Titi

14

attempt a burglary.

52. This attempt is again unsuccessful in producing any money or drugs. The group then heads back to Mechal's and Cocoa's apartment in Mount Morris, with Cocoa driving. Cocoa, Mechal and "Titi" remain and their participation is finished. However, Adrian notices that Petitioner's car is parked nearby.

53. Petitioner, accompanied by Adrian Paige, is able to walk to her car and start it, but as she starts driving - again in the direction of her home in Avon - she cannot keep her head up. She pulls into a "Kwikfill" gas station on North Main Street just a few yards from where she started. Adrian tells her she needs gas. She gets out and tries to operate the pump but cannot lift or direct the nozzle. Adrian asks her if she'd like him to pump the gas and drive. She says yes, gets in the passenger side front seat of her car and goes to sleep.

54. Adrian begins driving, but instead of going north towards his and the Petitioner's homes, he turns south. He goes to Nunda and picks up Shaun Theriault, who brings a shotgun. He then picks up Eric Harder - the Petitioner's rapist - from his place of work in Leicester. Then he drives back to the same Court Street location he had twice earlier attempted to rob: apparently, Adrian is very persistent and single minded. They arrive at the location about 4 AM.

55. Once again, Adrian stays in the car off site with the now incapacitated Petitioner. Shaun Theriault and Eric Harder exit the car with shotgun and masks, and a "walkie talkie" radio to stay in communication with Adrian while they are away. During the course of their pathetic robbery attempt, they hold one victim hostage at gunpoint while they sent another in search of more money. At one point, Adrian was worried about his voice being recognized over the radio, so he nudged the sleeping Petitioner and told her to "Tell them to hurry up." And she did, and her female voice was overheard by several of the other victims.

56. Harder and Theriault ditched the shotgun and masks and returned to the car. Adrian drove from Court Street in Geneseo back to Leicester to drop off Harder at work. As they were

driving back to Geneseo from Leicester, the Petitioner woke up in an emotionally agitated state and complained that she was hungry.

57. Adrian drove to the Geneseo Wegman's on Route 20A, parked in the parking lot and Petitioner went into the store to get something to eat. While she was in the store, Theriault used her cell phone to call the robbery victims and threaten them.

58. Petitioner returned to her car eating, feeling better and able to drive. She dropped Adrian Paige and Shaun Theriault off at or near Adrian's apartment and finally, on her third attempt since about five o'clock the previous day, was able to proceed home to Avon. While home a few hours later, she got a phone call from one of the robbery victims saying "we've got the money", or words to that effect. She asked who it was, and said she didn't know what they were talking about.

59. A few days later, Geneseo police showed up at the door of Petitioner's home in Avon. They had traced her cell phone number from the call Shaun Theriault made from the Wegman's parking lot and wanted to question her in connection with the robbery. They had also obtained statements from the robbery victims that they had heard a female voice on the walkie talkie radio during the course of the robbery.

60. At home at the time were the Petitioner and her younger sister, Britni Davis. The two were questioned but did not have much relevant information for the police, and what little they did provide was misleading. Shortly thereafter, Petitioner's parents obtained the services of an attorney. The attorney obtained an offer of immunity for the Petitioner in exchange for giving information about the robbery. Petitioner appeared with her attorney at the Geneseo police station on or about December 22nd, 2003.

61. Petitioner's primary concern at this point was that Eric Harder would kill her and her younger sister if she told the police what had really happened to her. In addition, she was getting phone calls from Angela Mastromonico, Adrian Paige's girlfriend, that she found vaguely

16

threatening. She didn't know anything about a robbery, as she had been asleep or passed out the whole time. She and her attorney prepared a written statement identifying two individuals she said she had met in Geneseo to "buy weed" on the day in question, but Petitioner really didn't know what she was talking about. She left the station without ever signing the statement. She was supposed to return later to sign it, but she never did.

62. After that she simply hoped the matter would go away. Her drug use and erratic behavior intensified.

63. Meanwhile, police were focusing their attention on Eric Harder. Upon information and belief, he had been identified at a roadblock set up shortly after the robbery took place, and the police kept after him. Finally, on January 23rd, 2004, Eric Harder gave a statement to police implicating himself, Adrian Paige, Eric Harder, and the Petitioner in the robbery. The statement was witnessed by a Mount Morris police officer named Dana Carson. Dana Carson had been a spurned suitor of the Petitioner from the time she was 17.

64. As a result of Eric Harder's statement, Petitioner was arrested that same day, at gun point, stopped as she was driving her car in Mount Morris. Her car was confiscated for evidence. She was arraigned in Geneseo Village Court on charges of Kidnapping and Armed Robbery. Her parents posted $25,000 bail and she was released.

65. Petitioner still hoped the matter would go away. Her drug use and erratic behavior intensified again. She was arrested and charged with Petit Larceny at the Eastview Mall in Victor, New York, and on a DUI charge in the Village of Mount Morris.[5]

66. On February 17, 2004, Petitioner learned that she was pregnant. She was sure this

---

[5] With the exception of charges being prosecuted by the Livingston County District Attorney, Petitioner's other legal matters can be, or have been, disposed of on a non-criminal basis.

17

was the result of Eric Harder's rape[6], but she was also sure that she could not, under pain of death for her and her sister, tell anyone the truth. So, out of desperation she told people otherwise - that it was her boyfriend's baby. He doubted it and insisted on a DNA test.

67. The Petitioner strongly disapproves of abortion, but she went to the hospital on March 7th, 2004, and after vacillating considerably, indicated that she wanted an abortion. She also indicated that she wanted an HIV test and an STD test. She was, finally, referred to Morris Wortman, M.D. in Brighton, New York and had an abortion.

68. In the meantime, in April of 2004, Adrian Paige and Shaun Theriault had been apprehended, and with a Grand Jury set to convene they, along with Eric Harder, entered guilty pleas in Livingston County Court in connection with the December 9th robbery. Eric Harder arranged the most satisfactory plea bargain, as he turned state's evidence first. He received a two year sentence and was shock camp eligible. He is already out on parole.

69. Petitioner's parents had by this time retained another attorney and plea negotiations were conducted. At this point, however, law enforcement and the District Attorney's Office were very frustrated with the Petitioner. The best deal that could be arranged for the Petitioner was a plea to a 'C' Felony with two years in state prison.

70. In June of 2004, Petitioner changed attorneys to the undersigned. By this time she was a thoroughly confused, terribly traumatized, injured and frightened young woman of 19. She had an obvious drug problem and was alternately passive and depressed, and then occasionally difficult, belligerent and evasive. She insisted she knew nothing about a robbery and steadfastly maintained her innocence, though she also expressed the thought, in despair, that she might as well take the two year deal.

---

[6]   When Petitioner was seen at Noyes Memorial Hospital on the morning of December 8th, 2003 - the day Harder raped her - she was given a pregnancy test. It came back negative, and she was discharged about noon. Harder raped her later that day.

### GRAND JURY PROCEEDINGS

71.  Ultimately the plea offer was rejected, and Livingston County District Attorney Thomas E. Moran, Esq., decided to seek a superceding indictment of the Petitioner.  When our office advised Mr. Moran that we intended to take the Petitioner into the Grand jury to testify, he responded "Make my day", as if we were in a Clint Eastwood movie.

72.  Meanwhile, undersigned counsel was experiencing major difficulties preparing the Petitioner for her very important testimony.  It became apparent that she really didn't know very much.  As the date for her testimony approached, I was actively seeking a method to obtain reliable information from Adrian Paige, who was incarcerated at the Livingston County Correctional Facility south of Mount Morris, but had not come up with one.

73.  Petitioner's first scheduled appearance was on October 6th, 2004.  But a few days before, she was involved as a passenger in a car accident in the Town of Pembroke.  She also picked up another charge of Unlawful Possession of Marijuana in connection with that accident. In any event, as a result her testimony was postponed one week at my request, to October 13th.

74.  In the interim, I arranged to see and talk to Adrian Paige, and did so on October 9th and 11th, 2004.  Adrian Paige provided me most of the information that led to discovery of the facts as I earlier related them in this Petition.

75.  Also, it was my discussions with Adrian Paige that first led me to suspect that the Petitioner had been raped by Eric Harder; but the Petitioner had not told me this; in fact, she had been telling me repeatedly that she did not know Eric Harder "at all, whatsoever" and that he had never been in her car.  When I learned quite the contrary from Adrian Paige, I did not believe that the Petitioner could adequately present herself before the Grand Jury unless she had psychiatric or psychological treatment.  But I already had requested one postponement and feared that a second request would not be agreed to, and her appearance would be deemed waived.

76.  So I resolved to take the Petitioner before the Grand Jury, to have her read a

statement which was as reliable as I could make it, and try to get the Grand Jury to call me as a witness, or to recall Adrian Paige (which he offered to do), or to subpoena relevant medical records, in the hope that they would investigate whether Petitioner had actually been the night's biggest victim, and of course refrain from indicting her. There is no procedure to stop a Grand Jury proceeding while a target's competence to testify is at issue.

77. On October 13th, 2004 the Petitioner and I appeared before the Livingston County Grand Jury to testify. Shortly after we began, a dispute erupted between Mr. Moran and myself as to what the Petitioner would be able to say. During some of our heated discussion, I told Mr. Moran that I thought the Petitioner had probably been raped. My recollection is that we made two trips to Judge Cicoria to resolve our differences. After the second trip, Judge Cicoria indicated that he did not want to hear further from either one of us for the rest of the day.

78. One of the disputes centered on whether the Petitioner could tell the Grand Jury what Adrian Paige had told me. Judge Cicoria ruled that she could not relate information from Adrian Paige, but that I could. However, in presenting my request to testify before the Grand Jury a bit later, Mr. Moran admonished them that my testimony would be "hearsay", even though hearsay is allowed in Grand Jury proceedings, and even though Judge Cicoria had specifically ruled that I could testify before the Grand Jury as to that information.

79. The Grand Jury declined to hear my testimony, or to recall Adrian Paige, or to subpoena medical records of the Petitioner, and then voted an indictment on every charge Mr. Moran asked of them: two counts of Kidnapping in the first degree A-1 Felonies; and a series of violent 'B' Felonies: one count of Robbery in the first degree; one count of Robbery in the second degree; one count of Burglary in the first degree, one count of Burglary in the second degree; and one count of Criminal Use of a Firearm in the first degree. All the charges stemmed from the armed robbery which took place at about 4 AM on December 9th, 2003. The Petitioner is indicted as an accessory, for "aiding and abetting" Adrian Paige, Shaun Theriault, and of

20

course Eric Harder - her rapist.  The Petitioner was arraigned on the indictment on November 23rd, 2004 and her bail was continued.

80.  After this, Petitioner went into a "tailspin", not surprising under the circumstances. She frequently evaded all contact with counsel, although she had, finally, admitted to me that Eric Harder had raped her in the fashion described above, in a highly emotional phone conversation which took place after a court appearance in Pembroke Town Court on November 9th, 2004.

### POST INDICTMENT PROCEEDINGS

81.  By Notice of Motion dated December 14th, 2004, I moved to dismiss the indictment "in furtherance of justice" in Livingston County Court, among other requests for relief.  See New York Criminal Procedure Law section 210.40.  Over the next month, Petitioner continued to evade me and missed several court appearances.  Her parents advised me that she was involved with a new boyfriend from the Buffalo area.  I then filed a supplemental motion arguing that she was not fit to proceed within the meaning of Article 730 of the New York Criminal Procedure Law, in January, 2005, along with requesting Judge Cicoria's recusal in the matter.  Petitioner finally made an appearance in Livingston County Court on February 1st, 2005 and was, later that day, taken to Rochester General Hospital on a Mental Health arrest.  She was released, however, and disappeared.

82.  On February 23rd, 2005 Petitioner was arrested in Buffalo and charged with Criminal Possession of a Controlled Substance in the 7th degree, a misdemeanor, and remitted to the Erie County Jail.  On March 8th, 2005, her bail was revoked in Livingston County Court.

83.  In the meantime, proceedings in Livingston County were held in abeyance pending a determination of Petitioner's competency.  She was ultimately examined separately by two state appointed psychiatrists in April and May, 2005.  One psychiatrist said she was fit to proceed; the other said she was not, unless a seizure disorder could be ruled out by a neurologist, which would

21

involve, among other tests, an MRI. Judge Cicoria ordered the Livingston County Mental Health

agency to designate an independent neurologist to examine the Petitioner, but as of this writing

no such neurologist has been appointed. In any event, it had been recently learned that the

Petitioner had become pregnant, and the MRI could not be done while she was in that condition.

84.  In June, Petitioner was readmitted to bail, although she was placed on house arrest at

her parents' home in Avon. After a conference with Judge Cicoria in July, it was decided that

the Petitioner's other motions could be argued without prejudice to her competency issue. Those

motions, primarily the motion to dismiss the indictment in furtherance of justice, were argued on

August 23rd, 2005. Judge Cicoria issued a decision denying substantially all Petitioner's motions

on September 20th, 2005. His written decision concluded that there was no "compelling factor"

warranting dismissal under CPL 210.40.

85.  The word "rape" does not even appear in the decision.

86.  By Notice of Motion dated October 11, 2005, Petitioner moved for leave to reargue

under New York Civil Practice Law and Rules section 2221. In that motion, undersigned

counsel placed squarely before Judge Cicoria all of the constitutional issues that are now raised

in this application.

87.  On October 16th, 2005, Petitioner gave birth to a six pound eleven ounce, apparently

quite healthy baby girl.

88.  The motion to reargue, along with a supplemental motion to renew, was argued

before Judge Cicoria on October 25th, 2005 shortly after 2 PM. The Petitioner was about fifteen

minutes late getting to Court. In the interim the District Attorney, Mr. Moran, expressed extreme

frustration with the Petitioner's tardiness, referred to her as "arrogant", and repeatedly threatened

to obtain a warrant for her arrest. When the Petitioner arrived a few minutes later with her father

and her nine day old baby that she is breast feeding, she explained that she had unexpectedly

needed to change her baby's diaper, which had delayed her a few minutes. I explained this to the

22

Court.  Mr. Moran made no apology for his unseemly outburst.

89.  During oral argument, undersigned counsel expressed incredulity at the apparent

position of the District Attorney and the Court that Eric Harder's rape of the Petitioner was

irrelevant to whether she should be prosecuted, although I still don't know if it is in fact

considered irrelevant, because neither the Court nor the District Attorney has even uttered the

word "rape" in connection with the prosecution of the Petitioner.  I also stated that the continued

prosecution of the Petitioner without first determining that issue was immoral and indecent.  In

response, Mr. Moran expressed offense at my comments and contended that I might be mentally

unbalanced, apparently heedless of the consequences of such a remark on the issue of whether

the Petitioner is receiving effective assistance of counsel.  All of my motions were then

summarily denied.

90.  It would appear that any rational consideration of the issues in state court pertaining

to the Petitioner is impossible at this point, and that communications between Petitioner,

Petitioner's counsel, the Court, and the District Attorney have completely broken down.


## PETITIONER HAS A CONSTITUTIONAL RIGHT
## TO BE FREE FROM THIS PROSECUTION

91.  We should begin here with the eleven year old Supreme Court decision in <u>Albright</u>

<u>v. Oliver</u>, 510 U.S. 266 (1994)  This was a plurality opinion that failed to get five votes on the

Supreme Court in support of any one opinion on the question of whether there is a "substantive

due process" right to be free from a wrongful criminal prosecution.

92.  Of course, <u>Albright</u> arose in a very different context:  an action under 42 U.S.C.

1983 after Albright's prosecution had already been halted, and abandoned, in the state system.

Yet, any reasoning on the constitutional question involved would apply here as well.  In addition,

Petitioner would note that in <u>Albright</u> there was no Grand Jury indictment, whereas in this case

there is, although I must hasten to add that the proceedings before the Grand Jury in Petitioner's

case were corrupted by prosecutorial misconduct and obvious perjury.

93. For purposes of this application, the most significant opinion would be the

concurring opinion of Justice Ginsburg, for she is the "Circuit Justice" for the Second Circuit in

which we are situated. While she declined to find a "substantive due process" right as requested,

she came down quite firmly in favor of a right to be free from a wrongful prosecution under the

fourth amendment as an "unreasonable seizure". In stating this position, she explained:

> "A person facing serious criminal charges is hardly freed from the
> state's control upon his release from a police officer's physical
> grip. He is required to appear in court at the state's command. He
> is often subject, as in this case, to the condition that he seek
> formal permission from the court (at significant expense) before
> exercising what would otherwise be his unquestioned right to
> travel outside the jurisdiction. Pending prosecution, his
> employment prospects may be diminished severely, he may suffer
> reputational harm, and he will experience the financial and
> emotional strain of preparing a defense."

94. I ask your honor, based upon the facts as alleged in this Petition, does the phrase

"emotional strain" even begin to describe what this Petitioner has been enduring for almost two

years now?

95. Bad as that is, however, it is not what makes the Petitioner's prosecution so fearfully

wrong and ultimately unconstitutional. Here are three important facts underlying the

constitutional claim:

a) The prosecution of the Petitioner was initiated by a statement taken from Eric Harder
on January 23rd, 2004. That statement resulted from Harder being contacted by a Mount Morris
Police Officer named Dana Carson[7], who was a frustrated would-be boyfriend of the Petitioner's.
In other words, the prosecution of the Petitioner was initiated based upon a collaboration
between her rapist and a spurned suitor. I'm sure Mr. Harder must find this quite amusing.

b) On October 9th and 11th, 2004, a key witness before the Grand Jury - Adrian Paige -
admitted to undersigned counsel facts that made it clear he had committed perjury[8], although he

---

[7]  I just learned the details of this on October 25th as a result of receiving, at the last minute before a
"Huntley" hearing, some Rosario material from Mr. Moran.

[8]  The perjury concerned the issue of who was driving Petitioner's car when the crimes were being carried
out. Adrian Paige had originally testified that Petitioner was driving. He then admitted to me that he was
driving while the Petitioner was incapacitated, along with many other relevant facts he had never been
asked. Interestingly, when the Petitioner's rapist testified before the Grand Jury, he let it slip that when he

did offer to return and correct his testimony while the Grand Jury still sat. The prosecutor was advised of the recantation and was, or should have been aware at that time (even though because of Grand Jury secrecy rules I myself was *not* aware) that it meant perjured testimony had been presented to the Grand Jury, but instead of trying to correct this problem he actively sought to prevent the Grand Jury from learning that they had been lied to, disregarding an evidentiary ruling from Judge Cicoria in the process.

c) The prosecutor, from the beginning, has deliberately frustrated undersigned counsel's efforts to conduct a thorough investigation of the matter by refusing to turn over relevant documents and information. He has statements from important witnesses he has not provided. He has phone records that I am no longer able to obtain directly from the phone company that he has not turned over. I have reason to believe he may have taped conversations of witnesses and perhaps the Petitioner, but he has not advised me and certainly hasn't provided such evidence.

96. I ask your honor to consider these facts in light of well established precedent that police officers must not knowingly base charges upon inherently unreliable witnesses, as in Albright; how much more should they be prohibited from being unreliable witnesses themselves, or, as in this case, inherently unreliable witnesses to the statements of *other* inherently unreliable witnesses?

97. Moreover, it is near axiomatic that a prosecutor cannot knowingly offer perjured testimony, and that doing so constitutes misconduct. Mooney v. Holahan, 294 U.S. 103 (1935); Napue v. Illinois, 360 U.S. 264 (1959); Pyle v. Kansas, 317 U.S. 213 (1942) Nor can he suppress evidence favorable to the accused. Brady v. Maryland, 373 U.S. 83 (1963) And these strictures apply to Grand Jury proceedings as well. U.S. v. Barsurto, 497 F.2d 781 (9th Cir., 1974); cf., U.S. v. Phillips Petroleum, 435 F.Supp. 610 (ND Okla. 1977)

98. As Justice Stevens said in dissent in Albright, "The Due Process clause ...[of the 14th amendment]...should therefore be construed to require a *responsible* determination of

---

was picked up from work in Leicester, on the way to the robbery, Adrian was driving. The prosecutor then glossed over this important information, only seeking to solicit testimony from Mr. Harder that the Petitioner was driving at some later point.

probable cause... 510 U.S. at _____ (Stevens, J., dissenting)(emphasis added.)  Although the

Grand Jury returned an indictment, no responsible determination of probable cause has been

made in this case.

## THE CONTINUED PROSECUTION OF THE PETITIONER CONSTITUTES A DENIAL OF DUE PROCESS IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES

99.  Petitioner, through undersigned counsel, moved to dismiss the indictment against her

under New York Criminal Procedure Law section 210.40.  That statute reads as follows:

```
S 210.40  Motion to dismiss indictment; in furtherance of justice.
   1.  An indictment or any count thereof may be dismissed in furtherance
of justice ............. even though there may be no basis for dismissal as a
matter of law .......... when such dismissal is required as a
matter of judicial discretion by the existence of some compelling
factor, consideration or circumstance clearly demonstrating that
conviction or prosecution of the defendant upon such indictment or count
would constitute or result in injustice.  In determining whether such
compelling factor, consideration, or circumstance exists, the court
must, to the extent applicable, examine and consider, individually and
collectively, the following:
   (a)  the seriousness and circumstances of the offense;
   (b)  the extent of harm caused by the offense;
   (c)  the evidence of guilt, whether admissible or inadmissible at
trial;
   (d)  the history, character and condition of the defendant;
   (e)  any exceptionally serious misconduct of law enforcement personnel
in the investigation, arrest and prosecution of the defendant;
   (f)  the purpose and effect of imposing upon the defendant a sentence
authorized for the offense;
   (g)  the impact of a dismissal upon the confidence of the public in
the criminal justice system;
   (h)  the impact of a dismissal on the safety or welfare of the
community;
   (i)  where the court deems it appropriate, the attitude of the
complainant or victim with respect to the motion;
   (j)  any other relevant fact indicating that a judgment of conviction
would serve no useful purpose.
   ...........................
   3.  An order dismissing an indictment in the interest of justice may
be issued upon motion of the people or of the court itself as well as
upon that of the defendant.  Upon issuing such an order, the court must
set forth its reasons therefor upon the record.
```

100.  The primary thrust of Petitioner's challenge to this statute, on procedural due

process grounds, is that it provides a procedural disincentive to granting the motion.  A judge

hearing the motion must set forth his reasons upon the record only if he grants it; if it is denied,

there is no such requirement, and in fact in the Petitioner's case the motion was denied without

26

making any findings with respect to the ten enumerated factors.

101. CPL 210.40 obviously is designed to provide a last-ditch safety valve to permit a Court to stop an unjust prosecution; but in requiring more effort to grant the motion than to deny it, it stacks the deck against the criminal defendant who might otherwise be spared the deleterious effects of a criminal prosecution. While recognizing that this is an important goal, CPL 210.40 fails to provide an even playing field in which that goal might be achieved.

102. It is difficult for me to explain how the state court could reject, out of hand - actually, ignore is a better word - the contention that Eric Harder's rape of the Petitioner constituted a "compelling factor" warranting dismissal of the indictment. The procedural disincentive contained in the statute itself is one explanation, and I submit that would make the statute constitutionally infirm.

## YOUNGER ABSTENTION DOES NOT APPLY; AND IF IT DOES, THIS CASE CONSTITUTES AN "EXTRAORDINARY CIRCUMSTANCES" EXCEPTION

103. It is respectfully submitted that in the first instance, your honor must view the well known doctrine announced in Younger v. Harris, 401 U.S. 37 (1971)[9] only in light of your honor's answer to the constitutional question posed by Albright; namely, whether there is a basic or more generalized constitutional right to be free from a wrongful prosecution. If there is, then Younger would not apply, because there cannot be a right without a remedy, and by definition in this habeas proceeding, all state remedies have been exhausted.

104. In addition, there is a specific statutory grant of authority to issue a stay of state court proceedings for habeas petitions. 28 U.S.C. 2251  This statute would control, rather than the Younger abstention doctrine. See also Ex Parte Young, 209 U.S. 123 (1908)

105. Moreover, the provisions of the Violence Against Women Act, originally passed in

---

[9]  The holding of Younger is that, absent "extraordinary circumstances", federal courts will not enjoin state court criminal proceedings.

1994 and as amended in 2005, provide a sound basis for federal court intervention that transcends the rule of "Younger abstention".

106.  Finally, even if <u>Younger</u> did apply here, it is respectfully submitted that the circumstances of this case are not only "extraordinary", but almost beyond belief.  There could not be more than a handful of prosecutors in the United States who would prosecute someone under these circumstances.  And if there were, there could not be more than a handful of courts that would permit it once those circumstances came to its attention.

WHEREFORE, Petitioner requests the following relief:

1.  That your honor issue a writ of habeas corpus commanding the production of the person of the Petitioner; that she be then and there freed from her unconstitutional custody and restraint; that her bail be exonerated; and that her car be returned in as good mechanical condition as the day on which it was unlawfully seized by police, at gunpoint, in January, 2004;

2.  An evidentiary hearing to inquire into all of the relevant facts and circumstances pertaining to this Petition;

3.  Under 28 U.S.C. 2251, a stay of any further prosecution of the Petitioner by the Livingston County District Attorney's office; and if your honor decides that the matter is not yet ripe to consider this request, a determination holding the question in abeyance until ripeness is reached;

4.  A permanent injunction barring further prosecution of the Petitioner by the Livingston County District Attorney on any charges currently pending against the Petitioner within his jurisdiction; or, in the alternative, a declaratory judgment that she is being prosecuted in violation of the Constitution of the United States;

5.  If warranted upon your honor's findings after the evidentiary hearing, initiation of federal criminal charges in the United States District Court for the Western District of New York against Eric Harder for retaliation against a victim, in violation of 18 U.S.C. 1513, and for Interstate Stalking, in violation of 18 U.S.C. 2261A, a component of the Violence Against Women Act; an Order referring the matter to the United States Attorney for the Western District of New York for prosecution; and a warrant for Eric Harder's arrest to be filed in the United States District Court for the Western District of New York and referred to United States

Marshals or agents of the Federal Bureau of Investigation for execution; and

      6. Such other, further and different relief which to your honor seems just, equitable and proper.

Dated:  November 2, 2005

                            Respectfully submitted,

                            JOHN M. REGAN, JR.
                            Attorney for Petitioner
                            SEPHORA K. DAVIS
                            Office and Post Office Address
                            29 Hoyt Place
                            Rochester, NY   14610
                            (585) 546-8880

## VERIFICATION

      I, JOHN M. REGAN, JR., ESQ., declare under penalty of perjury that I am the Petitioner's counsel, that I have read the Petition and that the contents of the same are true to the best of my knowledge, information and belief.  I am making this verification instead of the Petitioner because most of the matters described in the Petition are more within my knowledge than hers.

Dated:  November 2, 2005

                            JOHN M. REGAN, JR.